RENDERED: APRIL 19, 2024; 10:00 A.M.
TO BE PUBLISHED

# Commonwealth of Kentucky

# Court of Appeals

NO. 2023-CA-0748-MR

DEBORAH LLOYD          APPELLANT


|  |  |
|---|---|
| v. | APPEAL FROM JEFFERSON CIRCUIT COURT<br>HONORABLE TRACY E. DAVIS, JUDGE<br>ACTION NO. 20-CI-005331 |


NORTON HOSPITALS, INC. D/B/A
NORTON'S WOMEN'S AND
CHILDREN'S HOSPITAL;
CHRISTOPHER DALE HENLEY,
M.D.; DARREN CAIN, M.D.;
DIAGNOSTIC X-RAY PHYSICIANS,
PSC (DXP); AND SHEILA SLONE
KCSA          APPELLEES


OPINION
AFFIRMING IN PART
AND REVERSING IN PART

** ** ** ** **

BEFORE: CETRULO, GOODWINE, AND JONES, JUDGES.

CETRULO, JUDGE: This is an appeal from summary judgments granted in favor of three defendants in a medical malpractice action. We affirm one of those judgments and reverse the other two.

**FACTS**

Deborah Lloyd ("Lloyd") underwent a total knee replacement surgery on December 20, 2019 at Appellee Norton Hospitals, Inc. d/b/a Norton's Women's and Children's Hospital ("Norton"). Dr. Sean Griffin ("Dr. Griffin") performed the surgery. Appellee Sheila Slone ("Slone"), a surgical assistant who worked independent of the hospital and for various physicians on a per-patient basis, used a suture needle to close the outermost layer of skin on Lloyd's knee. While doing so, the needle became separated from the needle holder; therefore, when the nurses conducted an instrument count, the needle count was off. The nurses in the operating room and Dr. Griffin conducted a search for the needle but did not locate it. Dr. Griffin ordered an x-ray to determine whether the needle was in Lloyd's body. Dr. Griffin and two radiologists, Appellees Dr. Christopher Henley and Dr. Darren Cain ("the Radiologists"), each reviewed the x-rays and did not see the needle. Dr. Griffin then concluded that the needle was likely lost, and the wound should not be reopened to search for the needle.

A few weeks later, in a follow-up visit with Dr. Griffin, additional x-rays were conducted, and the needle was observed in Lloyd's knee. Lloyd's

medical records from that visit recorded that x-rays demonstrated the presence of a thin metal filament of unclear origin, but which could be from metallic instrumentation used during surgery. Two weeks later, Lloyd presented again with right knee pain. The record at that visit noted that "there is an associated foreign body on x-ray that is not visible at this time. I am going to recommend surgical treatment [in] order to prevent further complications including prosthetic infection." On February 7, 2020, Lloyd underwent a right knee wound revision and removal of the foreign body which, it was noted, appeared to be a suture needle.

In September 2020, Lloyd filed a complaint against Dr. Griffin, Slone, and Norton.[1] Lloyd subsequently amended the complaint to add the Radiologists. Lloyd settled her claims against Dr. Griffin, and he was dismissed as a party as the matter proceeded. A scheduling order required Lloyd to identify experts and provide disclosures by April 2022. Defendants were to provide disclosures by June 2022. For her expert witnesses, Lloyd identified Dr. Morrison, an infectious disease expert and Dr. Dysart, an orthopedic surgeon. The disclosures, required by Kentucky Rule of Civil Procedure ("CR") 26, stated in part, that Dr. Dysart would testify as follows:

---

[1] All parties refer to a circulating nurse or nursing staff in the operating room as the only employee(s) of Norton referenced in this matter. For ease throughout, we simply refer to those claims as against Norton.

Dr. Griffin failed to locate, remove, and document a suture needle, which had been confirmed by an incorrect instrument count. Retained foreign bodies are known to cause great risk to patients, including but not limited to infection and/or sepsis, possible re-operation, readmissions and prolonged hospital stays, sever[e] pain, and even death.

He is further expected to testify that [the Radiologists] had a duty to review, identify, and document the intra-operative and post-operative x-rays, showing the retained suture needle, and failed to do so. Failing to locate, identify, and remove the retained suture needle caused a delay in treatment and significant harm to [Lloyd], including but not limited to an infection which required two subsequent surgeries on February 7, 2020 and February 28, 2020, as well as long-term antibiotic use and chronic suppressive therapy which caused further health complications and harm to [Lloyd].

Thereafter, in August 2022, Dr. Dysart was deposed. During that deposition, he provided further criticism of Norton, the Radiologists, and Slone. He admitted that those criticisms were not contained within the disclosures or his prior written report. In October 2022, Dr. Morrison's deposition was taken. Lloyd's prior disclosures as to Dr. Morrison revealed that he would testify relative only to the care of the surgeon, Dr. Griffin. Early in his deposition, however, he elaborated that he would also provide testimony that the Radiologists and "agents of Norton" violated the standard of care in failing to follow hospital policy or their own protocol. Dr. Morrison's deposition was adjourned in progress with all

counsel agreeing that they would take this issue – whether Dr. Morrison could testify regarding the Radiologists and Norton – up with the trial court.

Norton filed a motion to strike various testimony and opinions of Lloyd's experts as to its staff. Lloyd then filed a motion for leave to amend the CR 26.02 disclosures to include some of Dr. Morrison's additional opinions. The trial court denied the motion to amend and granted Norton's motion to strike certain portions of Dr. Dysart's testimony from his deposition. At least two motions to reconsider those rulings were heard and denied.

Thereafter, Norton moved for summary judgment arguing that, without the testimony of Dr. Dysart against its nurse (which was stricken from his deposition), the case against Norton could not proceed. Similarly, Slone moved for summary judgment, followed by the Radiologists. In February 2023, the trial court[2] granted summary judgment for all three appellees, stating, in relevant part that

> [b]ecause of the court's prior rulings on November 23 and December 22, 2022, the court finds it will be impossible for [Lloyd] to now present evidence at the trial warranting a judgment in her favor. While the court believes its predecessor the Hon. Judge Mary Shaw, may have been overly harsh in these rulings, Judge Shaw was presented with the opportunity to revisit the issue and had the benefit of the parties' arguments concerning the same.

---

[2] Judge Mary Shaw presided over Division 5 of the Jefferson Circuit Court throughout most of these proceedings. Judge Tracy Davis took office in January 2023 and authored the opinion and order granting summary judgment in February 2023.

On appeal, Lloyd argues that the trial court erred in striking portions of Dr. Dysart's testimony and in granting the Radiologists' motion for summary judgment. As to Slone and Norton, Lloyd admits there was no specific expert critical of them after the trial court limited certain testimony and denied her motion to amend the disclosures. However, Lloyd argues that the doctrine of *res ipsa loquitor* should have been applied to allow those claims to proceed to a jury, with an inference drawn from the mere occurrence of the needle being left in the patient's body.

## STANDARD OF REVIEW

The standard of review on appeal when the lower court has granted a motion for summary judgment is whether the record, when viewed in a light most favorable to the non-moving party, shows no genuine issue of material fact so that the moving party is entitled to judgment as a matter of law. *Phoenix Am. Adm'rs, LLC v. Lee*, 670 S.W.3d 832, 838 (Ky. 2023) (citation omitted). As this is a legal question involving no factual findings, we review the grant of summary judgment *de novo*. *Brown v. Griffin*, 505 S.W.3d 777, 781 (Ky. App. 2016) (citation omitted). "[W]e generally review the grant of summary judgment without deference to either the trial court's assessment of the record or its legal conclusions." *Cantrell v. Conley*, 679 S.W.3d 1, 3 (Ky. App. 2023).

-6-

However, as to a trial court's evidentiary rulings, we review for an abuse of discretion. *Goodyear Tire & Rubber Co. v. Thompson*, 11 S.W.3d 575, 577 (Ky. 2000) (citations omitted). A trial court abuses its discretion only if its "decision was arbitrary, unreasonable, unfair, or unsupported by sound legal principles." *Miller v. Eldridge*, 146 S.W.3d 909, 914 (Ky. 2004) (citation omitted).

## ANALYSIS

### A.    Summary Judgment in favor of the Radiologists

Lloyd argues that the summary judgment in favor of the Radiologists should be overturned because: 1) portions of her expert's testimony were improperly excluded and 2) the expert, although not a radiologist, was still qualified to provide opinions as to the Radiologists.

Thus, we begin our analysis with consideration of the evidentiary ruling that struck expert testimony presented by Lloyd. As noted, all parties were given reasonable deadlines on disclosures of experts. Lloyd's experts were disclosed by April 1, 2022. The various defendants disclosed experts by June 2022. This began the process of scheduling expert depositions for a trial date set for February 2023.

In her Rule 26 disclosures, Lloyd did indicate that Dr. Dysart would provide opinions critical of Dr. Griffin, as well as the Radiologists. In August,

when Dr. Dysart was deposed, he also provided opinions that were critical of Norton and Slone.[3] Norton moved to strike the late-disclosed opinions, and Lloyd moved to amend her disclosures. The trial court held a lengthy hearing on these motions on November 23, 2022, and then signed an order prepared by counsel for Norton, striking those late-disclosed opinions and denying the motion by Lloyd to amend. Lloyd moved the trial court to reconsider, which was denied in December 2022. In the order, the trial court specifically stated that the "late-disclosed opinions of Dr. Dysart contained in his deposition from page 169 to the conclusion of his deposition on page 235 are hereby stricken from the record." Norton submitted this order, which was aimed at preventing the testimony regarding Norton's nurse. Specifically, the order stated that:

> [Lloyd's] experts are expressly prohibited from proffering testimony, either at deposition or trial, of any criticism they may have of [Norton] because [Lloyd] failed to timely disclose any such criticism in her expert disclosure filed on April 1, 2022.

We have found no indication throughout the very large record below that the Radiologists moved to strike Dysart's testimony or argued surprise or non-disclosed criticisms. Indeed, the disclosures, written report, and other non-stricken

---

[3] Dr. Morrison also provided opinions that were critical of several parties and purportedly not previously disclosed. Lloyd sought to amend her disclosures as to Dr. Morrison, which the trial court denied. However, the disclosures as to Morrison did indicate his opinions included that the suture needle was the causative source of plaintiff's subsequent infection. All parties agree that it is only the testimony of Dr. Dysart that is in issue on this claim.

testimony of Dr. Dysart included criticisms of the Radiologists for failure to observe the suture needle in the x-ray image, if nothing else.

However, armed with these rulings limiting testimony of Lloyd's experts, the Radiologists joined others in moving for summary judgment. The basis for their summary judgment motion was that expert witness Dr. Dysart was not an expert in the field of radiology, and that he could not testify that the Radiologists failed to act as "reasonable radiologists under the same or similar circumstances." The trial court's summary judgment as to the Radiologists concluded that Lloyd's failure to have an expert qualified in the field of radiology testify as to the standard of care was fatal to her case.

On review, we are limited to the record before us, but the record indicates Dr. Dysart *was* critical of the Radiologists for their failure to observe the needle on x-rays conducted on the day of surgery. When asked about the images he reviewed, he indicated that he was qualified to describe them and interpret them. While he testified that he was not a radiologist, he stated "from an orthopedic opinion, [the Radioligist] missed it – which is a disaster." While some of his specific criticisms were set forth in more detail in the pages stricken by the trial court's subsequent order, these criticisms remained in the record at the time of the Radiologists' motion for summary judgment.

Secondly, Lloyd's initial disclosures revealed that Dr. Dysart would be critical of the Radiologists' failure to diagnose or observe the needle. The written report of Dr. Dysart was similarly critical of the Radiologists' failure to recognize the presence of a foreign object (the needle) on x-ray. Dr. Dysart was cross-examined on the fact that he is an orthopedic physician, and not a radiologist. He acknowledged that he has a different specialty; however, he also testified that he was very familiar with reviewing films, particularly in orthopedic circumstances:

> So, in my experience dealing with multiple radiologists, we can often read a film better than they can about a specific issue; and the reason is we see many, many more of the same thing.

As such, regarding the Radiologists, the issue before the trial court was whether it would be impossible for Lloyd to proceed against the Radiologists without expert testimony from a physician in the same specialty. The trial court held that it would and granted summary judgment on that basis.

The Radiologists assert that plaintiffs in a medical malpractice case are required to present expert testimony establishing the standard of care expected of the "class of physicians or specialists to which he belongs." However, our caselaw indicates that once the trial court determines the expert is properly qualified, the jury is responsible for weighing the expert's testimony. *See Washington v. Goodman*, 830 S.W.2d 398, 400 (Ky. App. 1992) (citations omitted)

(stating factors like qualifications, experience, and training go to the weight of the testimony, not admissibility). *See also Lee v. Butler*, 605 S.W.2d 20 (Ky. App. 1979), and *Ingersoll-Rand Co. v. Rice*, 775 S.W.2d 924 (Ky. App. 1989), *abrogated on other grounds as recognized in Cont'l Marine, Inc. v. Bayliner Marine Corp.*, 929 S.W.2d 206 (Ky. App. 1996). Likewise, this Court has recognized that "[t]here are numerous reported cases where a physician has been held qualified to express an opinion on medical matters outside his area of expertise." *Owensboro Mercy Health Sys. v. Payne*, 24 S.W.3d 675, 677-78 (Ky. App. 1999) (citations omitted). *See also Tapp v. Owensboro Med. Health Sys., Inc.*, 282 S.W.3d 336, 339 (Ky. App. 2009).

In *Tapp*, this Court explained that an "expert witness assessment turns on whether the proposed witness's special knowledge, skill, experience, training, or education will assist the jury." *Id.* at 341 (citing Kentucky Rule of Evidence ("KRE") 702 and *Stringer v. Commonwealth*, 956 S.W.2d 883, 891 (Ky. 1997)). "[A] physician or other medical provider is not automatically disqualified from testifying against a defendant who specializes in a different area of medicine or who is licensed or practices in a different medical discipline." *Id.* (citing *Payne*, 24 S.W.3d at 677-78). Indeed, in *Tapp*, a physician testified as to the care rendered by a nurse, stating that he was "familiar with the standard of care expected of hospitals and their nurses under the circumstances faced by the nurses" in that

-11-

case. *Id.* at 339. This Court found that such qualifications have been deemed sufficient to render a physician qualified to provide expert testimony. *Id.* (citation omitted).

To be clear, we do not find the trial court abused its discretion in striking portions of Dr. Dysart's testimony because "[a] trial court has broad discretion in addressing a violation of its [discovery order.]" *Turner v. Andrew*, 413 S.W.3d 272, 279 (Ky. 2013) (internal quotation marks and citation omitted). However, the trial court did abuse its discretion in determining that there was insufficient evidence in Dr. Dysart's remaining testimony to submit to a jury on Lloyd's claims that the Radiologists failed to diagnose or locate the suture needle. As discussed, testimony from a medical provider who specializes in a different area of medicine or who is licensed or practices in a different medical discipline may not carry as much weight with a jury. *Payne*, 24 S.W.3d at 677-78.

Here, the trial court based its summary judgment in favor of the Radiologists on a determination that it would be impossible for Lloyd to proceed to trial without an expert qualified in the field of radiology. However, Dr. Dysart was qualified to testify regarding the Radiologists; therefore, there was a genuine issue of material fact for the jury to review. *See Goodman*, 830 S.W.2d at 400. Thus, as to the Radiologists, we reverse the summary judgment in their favor.

-12-

**B. Summary Judgment in Favor of Slone**

We also reverse the summary judgment in favor of Slone. The trial court entered judgment on different grounds for each defendant in its consolidated opinion and award. Lloyd admits that there was no specific expert disclosed in her CR 26 compliance to criticize Slone. Likewise, the trial court largely excluded the criticisms regarding Slone from the experts' depositions and then concluded that the case against her could not proceed without expert testimony. However, Lloyd counters that expert testimony is not required in a *res ipsa loquitur* case where the jury can reasonably infer both negligence and causation from the mere occurrence of the event. Thus, as to Slone, the issue is the applicability of the *res ipsa loquitur* doctrine.

> The Kentucky Supreme Court has explained
>
> [m]ost medical malpractice claims involve issues of science or professional skill outside the ordinary experiences and range of knowledge of typical jurors and judges. For that reason, most, but certainly not all, medical malpractice claims cannot be proven without expert opinion testimony to establish that the conduct in question departed from the applicable standard of care and was a proximate cause of the damages claimed.

*Adams v. Sietsema*, 533 S.W.3d 172, 179 (Ky. 2017).

Thus, typically, "the plaintiff in a medical negligence case is required to present expert testimony" establishing both "the standard of skill expected of a reasonably competent . . . practitioner" and the proximate cause of the injury.

-13-

*Andrew v. Begley*, 203 S.W.3d 165, 170 (Ky. App. 2006) (citations omitted).

There are two very limited exceptions to that requirement outlined in our jurisprudence. *Id.* (citation omitted). First, expert testimony is not required when "the common knowledge or experience of laymen is extensive enough to . . . infer negligence from the facts." *Jarboe v. Harting*, 397 S.W.2d 775, 778 (Ky. 1965) (citation omitted).

The first exception applies only when "any layman is competent to pass judgment and conclude from common experience that such things do not happen if there has been proper skill and care[.]" *Perkins v. Hausladen*, 828 S.W.2d 652, 655 (Ky. 1992) (citation omitted). If the doctrine applies, negligence can be inferred, even in the absence of expert testimony. *See id.* at 654-55.

Lloyd argues that the doctrine is particularly applicable in a retained foreign object case and that this case falls within the first exception. Indeed, our Supreme Court has stated cases in which a foreign object had been left in the patient's body during an operation illustrated the "common knowledge" exception. *Id.* at 655 (citation omitted). Our Supreme Court recently reaffirmed that the first exception is best "illustrated by cases where the surgeon leaves a foreign object in the body or removes or injures an inappropriate part of the anatomy." *St. Elizabeth Med. Ctr., Inc. v. Arnsperger*, ___ S.W.3d ___, 2024 WL 316434, at *4 (finality

entered by Kentucky Supreme Court on Feb. 8, 2024) (citing *Hausladen*, 828

S.W.2d at 655).

Second, expert testimony is also not required where other medical

testimony provides an adequate "foundation for *res ipsa loquitur* on more complex

matters." *Hausladen*, 828 S.W.2d at 655 (citation omitted). Citing *Nazar v.*

*Branham*, 291 S.W.3d 599, 604 (Ky. 2009), Lloyd further quotes our Supreme

Court holding that "juries should generally be permitted to determine a healthcare

professional's liability in a retained foreign object case." This is the classic case,

Lloyd argues, to permit a jury to infer negligence from the mere fact of the retained

foreign object, while also giving them the latitude to analyze other facts and

evidence relevant to liability and responsibility for the fact that an item was left in

a patient's body. We agree that based upon our precedent, the *res ipsa loquitur*

doctrine applies and based upon these facts, both exceptions to the requirement of

expert testimony apply.

Kentucky has adopted the majority view that "the *res ipsa loquitur*

doctrine is an evidentiary doctrine which allows a jury to infer negligence on the

part of the defendant." *Baxter v. AHS Samaritan Hosp., LLC*, 328 S.W.3d 687,

692 (Ky. App. 2010) (citing *Sadr v. Hager Beauty Sch., Inc.*, 723 S.W.2d 886, 887

(Ky. App. 1987)). Therefore, if the doctrine of *res ipsa loquitur* is applicable, it

-15-

creates a question of fact for the jury and may enable a plaintiff to survive a summary judgment motion. *Id.* at 691.

The highest Court in Kentucky has found *res ipsa loquitur* to apply in numerous situations:

> *Jewish Hospital Association of Louisville, Ky. v. Lewis*, Ky., 442 S.W.2d 299 (1969), holding *res ipsa loquitur* applied where there was extensive bleeding following a catheterization procedure; *Neal v. Wilmoth*, Ky., 342 S.W.2d 701 (1961), holding *res ipsa loquitur* applied where the dentist's drill slipped off the tooth; *Meiman v. Rehabilitation Center*, Ky., 444 S.W.2d 78 (1969), holding *res ipsa loquitur* applied where a bone was broken during therapy treatment; and *Laws v. Harter*, Ky., 534 S.W.2d 449 (1976), holding that *res ipsa loquitur* applied where a sponge was left in the patient during a surgical procedure. In all of these cases an inference of negligence was sufficiently supplied by medical testimony of record even though the plaintiff had no expert witness to opine that the conduct fell below the standard of acceptable professional care.

*Hausladen*, 828 S.W.2d at 655.

Here, as in *Hausladen*, the medical evidence of record established that this type of injury was not an ordinary risk of the surgery; that the method by which it occurred was within the exclusive control of Slone; and that the injury was not due to any voluntary action or contribution on the part of Lloyd.[4] Here,

---

[4] We recognize the argument that Slone lacked the authority to reopen without the doctor's direction, and this may be an argument for subsequent motions, but the trial court did find as a factual finding that the instrumentality was within the exclusive control of Slone.

the fact that a surgical instrument was left in Lloyd's body was not an ordinary risk of surgery and we have been directed to no testimony that otherwise questioned causation.

This case is unlike *Green v. Owensboro Medical Health System, Inc.*, 231 S.W.3d 781, 784 (Ky. App. 2007), where this Court upheld a summary judgment in the absence of medical testimony even though a patient went into surgery for her hand and woke up with four loose bloody teeth. There, the Court stated that

> [w]hile it seems unusual for a patient to enter an operating room for hand surgery with teeth intact and emerge with loose, misaligned, and bloody teeth, we do not believe a layman, without medical expert testimony identifying the required standard of care and the breach thereof, could competently determine an anesthesiologist, surgeon, and/or health care facility did something wrong before, during, and/or after Green's surgery so as to cause damage to her teeth. Such medical negligence would have been even less obvious to the average juror in the present case because Green admitted in her deposition that she suffers from multiple sclerosis and periodontal disease, thereby possibly making her more prone to dental injury.

*Green*, 231 S.W.3d at 784.

Here, in contrast, there was a suture needle inside the knee on which Lloyd had surgery. Lloyd went into surgery without a needle in her knee and left with one. The trial court specifically found that the only defendant who had control of that instrumentality was Slone. Further, the record indicated that the

-17-

needle was the cause of Lloyd's subsequent revision surgery. Still, the trial court stated that the *res ipsa loquitur* presumption was rebutted by the fact that Lloyd's expert witness did not specifically testify as to negligence on the part of Slone. Indeed, Lloyd's expert agreed that a suture needle could become detached without any negligence on the part of Slone. However, that alone does not rebut the reasonable inference that a needle should not *remain* in the body of a patient.

In fact, Dr. Griffin testified that they "looked for the needle and didn't find it and therefore determined that the object was very unlikely to be left in her body and that it was most likely lost." Obviously, that conclusion was incorrect. Subsequently, Dr. Griffin testified that at the second surgery, when this needle was retrieved, it was confirmed to be the suture needle from the first surgery. Slone testified that the needle became separated from the holder and was missing, and the trial court found it was within her exclusive control. The fact that the needle was left and that it caused injury to Lloyd is certainly something that the jury could infer through common knowledge as something that should not have happened. It is a matter of common understanding to any layperson that a needle does not remain in a patient's body after surgery "if there has been proper skill and care." *See Hausladen*, 828 S.W.2d at 655 (citation omitted).

On appeal, Slone acknowledges that Lloyd was seeking to hold her liable for two discrete events: 1) allowing the needle to become separated from the

-18-

needle holder and land within the surgical field and 2) failing to find the needle and remove it before the surgery was concluded. Slone argued successfully below that neither of those theories could be presented to the jury in the absence of expert proof. However, we do not read our caselaw that restrictively. The doctrine of *res ipsa loquitur* recognizes that as a matter of common knowledge and experience the very nature of an occurrence may justify an inference of negligence on the part of the person who controls the instrumentality causing the injury. *See id.*

Whether a jury would assess liability or whether the case would survive a directed verdict remains to be seen. Slone's disclosures indicated that her expert witness would testify that she acted appropriately in response to this event, and that she did not have the authority to reopen without the express order from Dr. Griffin. Slone's argument on appeal is that, as a surgical assistant, she was limited to what she could do upon discovery of the missing needle. While those may be valid defenses before a jury, the inference is not defeated by those facts as a matter of law.

The final requirement for *res ipsa loquitur* to apply is causation, *i.e.*, that "[t]he plaintiff's injury must have resulted from the accident." *Cox v. Wilson*, 267 S.W.2d 83, 84 (Ky. 1954). That, too, is present here. Although the doctrine is inapplicable "where more than one inference can be drawn from the evidence as to the cause of the injury," we find no alternative causes here. *See Schroerlucke v.*

*McDaniel Funeral Home, Inc.*, 291 S.W.2d 6, 8 (Ky. 1956) (citation omitted).

Here, the record does not indicate any cause for Lloyd's complications or subsequent revision surgery other than the suture needle remaining in her knee.

In *Arnsperger*, 2024 WL 316434, at *2, a patient being wheeled through a medical facility by hospital staff was purportedly knocked against a registration desk. This "collision" allegedly displaced surgical hardware and required further surgery on the patient's ankle, which had recently been operated on. *Id.* There was no expert testimony to the effect that this "collision" caused the displacement of the hardware. *Id.* Because the trial court determined testimony on causation was required and the patient failed to provide any, it granted summary judgment. *Id.* at *3. This Court reversed the trial court based on the belief that the patient's injuries did "not require a medical expert to relay to a layperson the cause-and-effect relationship between the hospital staffer employee's conduct and [the patient's] injury. *Id.* However, our Supreme Court reinstated the summary judgment, finding that "[t]he instrumentality which caused the injury [was] disputed, thus, that the injury was caused by the desk collision [was] disputed." *Id.* at *5. There, the Supreme Court noted that the patient had a complex medical history involving the injured ankle and had complications during his most recent surgery; therefore, the issue was whether the act of pushing the patient into the desk *caused* his claimed injuries. *Id.* at *2. The Supreme Court found that the

causation of the injury under such circumstances was "beyond the common knowledge of the jury." *Id.* at *5. Further, the patient had undergone a surgery on the same ankle only days before the "collision," and the successful outcome of that surgery was still in question at that time. *Id.*

In contrast, here, there was no dispute that the needle was left in Lloyd's body during her knee replacement surgery. Additionally, there was no dispute that her subsequent medical treatment was caused by the retained foreign object. As such, the record indicates that Lloyd's injury – and subsequent surgery – resulted from the "accident," *i.e.*, the needle being left in her knee. *See Cox*, 267 S.W.2d at 84.

We also distinguish *Ashland Hospital Corporation v. Lewis*, 581 S.W.3d 572, 578-79 (Ky. 2019), where our Supreme Court held that *res ipsa loquitur* could not be used to establish causation against a radiologist who had failed to diagnose a stroke following a cerebral angiogram. There, the patient argued the doctrine applied because the necessity of prompt treatment for strokes was a matter of common knowledge. *Id.* at 578. The Supreme Court disagreed, concluding that "increased public awareness and knowledge about stroke symptoms and timely intervention . . . cannot provide the medical expertise necessary to evaluate this particular claim of medical malpractice." *Id.* at 578-79. Moreover, there were issues as to whether the failure to timely diagnose a stroke

caused an injury other than that which would have resulted from the stroke itself. *Id.* at 575.

In contrast, here there was no dispute as to causation, and improperly leaving a surgical instrument in the body, as was done here, *is* a matter of common knowledge appropriate for *res ipsa loquitur* application. As our Supreme Court held in *Nazar*, "[u]nder this standard, juries may – but are not required to – infer negligence from the fact that a surgical item was left in a patient's body." *Nazar*, 291 S.W.3d at 603. Namely, there is a genuine issue of material fact.

As these recent Supreme Court cases illustrate, the Court has warned against efforts to expand the *res ipsa loquitor* exception and to virtually eliminate the need for expert opinion evidence in medical malpractice actions. *See Ashland Hospital*, 581 S.W.3d at 579 (citation omitted) (acknowledging "Kentucky's long-standing practice of requiring expert opinion evidence in medical malpractice actions to assist the finder-of-fact"; *see also Arnsperger*, 2024 WL 316434, at *4 (citation omitted) ("[I]t is not the first time in recent history this Court has felt the need to check an unwarranted expansion of *res ipsa loquitur* for questions of causation in the medical context.")).

However, our ruling here does not expand the doctrine, but rather recognizes that this is the very type of case upon which the doctrine's foundational principles are based. The *res ipsa loquitur* inference applies and as such, Lloyd

was entitled to proceed beyond summary judgment without expert testimony critical of Slone.

### C. Summary Judgment in Favor of Norton

The same cannot be said, however, as to the judgment in favor of Norton. All agree that the only relevant employee of Norton in issue was the circulating nurse. Norton's nurse charted the incorrect instrument count and the search efforts for the needle. She also recorded that Dr. Griffin ordered, read, and cleared an x-ray. The disclosures by Lloyd required by April 1, 2022 did not list any nursing experts who would provide testimony or indicate any criticism as to Norton's staff. For their disclosures, Norton indicated that their experts would testify that the staff appropriately performed their duties, including documenting the incorrect count during the skin closure, performing an appropriate search for the needle, obtaining imaging per physician's order, and relaying information about the missing needle.

Further, there was no evidence that Norton's nurse was in control of the suture needle that remained lodged within Lloyd's knee. If there was any failure on the part of Norton, Lloyd did not allege that Norton staff created or contributed to the presence of the retained object or the subsequent complications. Neither control of the instrumentality nor causation was ever established as to Norton. Also, other evidence of record did not provide even circumstantial

-23-

evidence by which a jury could infer negligence. *Hausladen*, 828 S.W.2d at 656 (citation omitted). Thus, to proceed beyond summary judgment, against Norton, expert testimony was required. Lloyd's counsel has admitted they failed to timely disclose any expert critical of Norton.

Lloyd argues though that Norton produced evidence regarding its protocol or internal policies on handling of an improper needle count. Then, in the deposition of Dr. Dysart, he relied upon those policies to criticize Norton. The trial court excluded that portion of his testimony because the Rule 26 disclosures had not indicated that any expert would be critical of Norton or its nurse. We have already addressed the trial court's evidentiary ruling and found that there was no abuse of discretion.

Moreover, Lloyd cannot simply rely upon the hospital's policy without expert testimony, to establish the standard of care. Our Supreme Court has "previously held that a hospital's internal policies and procedures, in and of themselves, do not establish the standard of care." *Ky. Guardianship Adm'r, LLC v. Baptist Healthcare Sys., Inc.*, 635 S.W.3d 14, 37 (Ky. 2021) (citing *Lake Cumberland Reg'l Hosp., LLC v. Adams*, 536 S.W.3d 683, 696 (Ky. 2017)). Without admissible testimony establishing a breach of the standard of care and causation, and without applicability of *res ipsa loquitur*, Lloyd failed to prove her theory that Norton, by some unknown action of its nurse, violated its duty to her.

Therefore, there is no genuine issue of material fact regarding Norton, and the trial court properly granted summary judgment.

For the foregoing reasons, the summary judgments in favor of Slone and in favor of the Radiologists are REVERSED AND REMANDED for further proceedings consistent with this Opinion; and the judgment in favor of Norton is AFFIRMED.

ALL CONCUR.

BRIEFS FOR APPELLANT:

Richard P. Schiller
Louisville, Kentucky

BRIEF FOR APPELLEE
DIAGNOSTIC X-RAY
PHYSICIANS, P.S.C.,
CHRISTOPHER DALE HENLEY,
M.D., AND DARREN L. CAIN,
M.D.:

Craig L. Johnson
Robert L. Whitmer
Louisville, Kentucky

BRIEF FOR APPELLEE
SHEILA SLONE:

Edward H. Stopher
Charles H. Stopher
Louisville, Kentucky

BRIEF FOR APPELLEE
NORTON HOSPITALS, INC. D/B/A
NORTON'S WOMEN'S AND
CHILDREN'S HOSPITAL:

Karen L. Keith
Virginia Leigh Schell
Louisville, Kentucky